IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
(DALLAS DIVISION)

ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JAN 1 8 2006

CLERK, U.S. DISTRICT COURT
By _____
                    Deputy

| | | |
|---|---|---|
| STANLEY INDUSTRIES | ) | |
| OF NORTH FLORIDA, INC. | ) | |
| d/b/a GALLERY INDUSTRIES | ) | C.A. No. 8-05CV2499-L |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| J.C. PENNEY COMPANY, INC., | ) | |
| And J.C. PENNEY CORPORATION, INC. | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS

Defendant, J.C. Penney Corporation, Inc. ("Defendant" or "J.C. Penney"), by and through

the undersigned counsel, pursuant to Fed. R. Civ. P. 12(b)(6), 9(b), hereby submits its

Memorandum of Law in Support of its Motion to Dismiss certain claims set forth in the Plaintiff's

("Plaintiff" or "Stanley") Original  Complaint.

### I. INTRODUCTION

Plaintiff, a Florida corporation, founded under the name of "Alexander Shirt Company is a

manufacturer of men's, women's and children's clothing [Pl. Com. ¶6].  In March, 1997, Plaintiff

executed a contract, called a "Trading Partner Agreement" ("TPA"), to sell apparel to J.C. Penney.

[*Id.*, ¶ 7[1]].  The TPA contains several terms that are material for purposes of this motion,

including:

---

[1]    A copy of the full text of the TPA is attached hereto as Exhibit A for reference.  Although the TPA was filed
along with Plaintiff's Complaint, "documents attached by the defendant to a Rule 12(b)(6) motion are considered
part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim."  *Brigs v.
Dart Regional Rail Co.*, Case No. Civ. A. 305cv1358G, 2005 WL 3133505 at *2 (N.D. Tex. Nov. 23, 2005)
(citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496 (5th Cir. 2000).



- NO MODIFICATION OF THE TERMS OF THIS CONTRACT SHALL BE VALID UNLESS IN WRITING AND SIGNED BY THE RESPONSIBLE PENNEY MERCHANDISE MANAGER OR ONE OF HIS/HER SUPERIORS.

[TPA, ¶ 27, p. A-8, Ex. A].

- THIS AGREEMENT AND THE APPPENDIX CONSTITUTE THE COMPLETE AGREEMENT OF THE PARTIES RELATING TO THE MATTERS SPECIFIED IN THIS AGREEMENT AND SUPERSEDE ALL PRIOR REPRESENTATIONS OR AGREEMENTS, WHETHER ORAL OR WRITTEN, WITH RESPECT TO THESE MATTERS. NO ORAL MODIFICATION OR WAIVER OF ANY OF THE PROVISIONS OF THIS AGREEMENT WILL BE BINDING ON EITHER PARTY.

[TPA, Section 4.3, p. 3].

- CHARGEBACKS. UPON PENNEY'S (A) RETURN OF DEFECTIVE, LATE, UNAUTHORIZED, OR RECALLED MERCHANDISE, (B) DESTRUCTION OR OTHER DISPOSITION OF DEFECTIVE OR RECALLED MERCHANDISE, (C) DISCOVERY THAT MERCHANDISE WAS OMITTED BY SELLER IN PACKING,   OR (D) EXERCISE OF ANY OF ITS RIGHTS UNDER SECTION 10 ABOVE WITH RESPECT TO ANY QUANTITY OF MERCHANDISE THAT IT HAS RECEIVED, PENNEY MAY, IN LIEU OF REQUESTING A REFUND OR REIMBURSEMENT FROM SELLER, ISSUE A CHARGEBACK AGAINST SELLER'S ACCOUNT FOR  THE PURCHASE PRICE OF SUCH MERCHANDISE, PLUS ANY ANCILLARY COSTS AND ANY OTHER RELATED COSTS AND EXPENSES OF PENNEY…FOR WHICH SELLER IS RESPONSIBLE HEREUNDER …

[TPA, Section 11, p. A-4, Ex. A].

- SETOFF. PENNEY MAY SETOFF AGAINST ANY AMOUNTS PAYABLE TO SELLER ALL PRESENT AND FUTURE INDEBTEDNESS OF SELLER TO PENNEY ARISING FROM THIS CONTRACT OR ANY OTHER TRANSACTION OR OCCURRENCE.

[TPA. Section 25, p. A-7, Ex. A].

Plaintiff brings suit claiming that J.C. Penney breached its contract because it materially altered the way it did business between 1997 and 2002, and in doing so, failed to pay an unspecified sum of money in excess of $250,000 for merchandise, which Plaintiff claims was provided to the Defendant. Plaintiff further complains about chargebacks assessed against its

account by J.C. Penney, [Pl. Com. ¶ 7] and that its original contract was unilaterally modified by communications which occurred after the TPA was executed. Aside from contractual claims, Plaintiff also alleges fraud, negligent misrepresentation, usury and UCC violations.

As will be shown, the following causes of action are without merit and must dismissed in their entirety:

1. **Count VI: Fraud Claim Fails as a Matter of Law and is Factually Deficient**

- Plaintiff's fraudulent inducement claim fails as all "representations" referenced in its First Amended Complaint occurred months *after* the contract was executed, thus they could not have induced Plaintiff to enter the contract.

- The contract contains an integration clause that clearly and unambiguously expresses the parties' agreement that no oral or written modifications of the agreement are binding, and the contract terms supersede all prior representations or agreements in whatever form. This clause negates any reasonable reliance on emails as modifying contractual terms.

- To the extent Plaintiff is attempting to claim some form of inducement to perform their duties under the contract by virtue of email messages (or the lack thereof) from a J.C. Penney buyer, the claim fails given Plaintiff's agreement, as expressed in the freely negotiated, arm's length contract, that no oral or written modifications are binding unless **in writing** and **signed** by a **Penney Merchandise Manager** or his/her superior. None of the emails referenced fit this criterion and such a document is not alleged to exist.

- Despite attaching several email strings and one memo, Plaintiff's factual allegations still do not satisfy the heightened pleading requirements of Fed. R. Civ. P. 9, as Plaintiff fails to identify the specific affirmative statements that were false and how they were reasonably relied upon to its detriment.

2. **Count VII: Negligent Misrepresentation Claim Fails Due to Lack of Reliance; the Statute of Limitations and the Economic Loss Rule**

- The plain language of the TPA preclude any alleged reliance on email messages as modifying contract terms.

- Plaintiff's negligent misrepresentation claim, to the extent Plaintiff relies upon statements made prior to August 6, 2002, is barred by the statute of limitations.

- A negligent misrepresentation claim premised on failure to pay an amount owed pursuant to contract is a quintessential example of a claim precluded by the

Defendant's Motion to Dismiss Brief
Page 3 of 18

Economic Loss Rule.

**3.   Count V: No Claim established for Action for the Price**

Plaintiff's claim for Action for the Price also fails since the contract clearly dictate the terms of the parties' remedies.

**4.   Count VIII: Usury Claim Fails Since No Loan Occurred Between the Parties**

The Plaintiff's claim for Usury fails since there were never any loans between the parties. Thus, the statute upon which the Plaintiff relies is inapplicable.

**5.   Given Express Contract, Quantum Meruit Claim Fails**

For the foregoing reasons, Counts II, III, IV and V and the exemplary damages and *Quantum Meruit* demands of Plaintiff's First Amended Complaint should be dismissed.

## II.   STATEMENT OF FACTS

Plaintiff is a "Florida corporation that manufactures men's, women's and children's clothing. [Pl. Com. ¶ 4, 6]. In March 1997, Plaintiff executed the TPA, which set forth terms under which Plaintiff would supply apparel to J.C. Penney. [*Id.*, ¶ 7, Ex. A]. Among these terms and conditions is an integration clause, providing that the written contract supersedes all prior oral or written representations or agreements. In this same provision is a clause specifically requiring that any modification of the contract be in writing and signed by "an authorized J.C. Penney Merchandise Manager or his/her superior." [TPA, Section 3.1, p. 2, Ex. A]. These terms are complemented by another provision:

> If any other document, whether in written or electronic form, contains any language which would modify, release or discharge Seller from any of its obligations under this Agreement or any agreement referenced in the Appendix, that language will be of no effect unless reference is made, in writing, to this Section 3.1 and/or to the other agreement and, in either case, the document is acknowledged and accepted in writing by an authorized representative of Penney.

[TPA, Section 3.1, pp. 2-3, Ex. A].

In addition to these unambiguous terms expressing the parties' intent regarding the non-enforceability of extra-contractual oral and/or written communications, the TPA sets forth J.C. Penney's right, under a variety of circumstances, to issue chargebacks and offsets to Plaintiff's account in lieu of requesting a refund. Plaintiff refers to these chargebacks as penalties. However, Plaintiff may wish to characterize them, they are an agreed-upon term and condition. The provisions granting J.C. Penney the right to issue chargebacks are expressed in Paragraphs 11 and 25 of the TPA. Plaintiff agreed to these provisions by signing the TPA.

Plaintiff now characterizes chargebacks as "unconscionable" and alleges that it was unfairly penalized by the defendant through the imposition of the same.

Plaintiff alleges that as a result of J.C. Penney's deductions, holds, offsets and concessions, (chargebacks) to Plaintiff's account, Plaintiff sustained the following losses: the monetary difference between the amount invoiced and the amount paid; lost profit; and the "market value of its business." As to the latter loss, Plaintiff alleges that "[b]ecause of Penney's refusal to pay what it owed, Plaintiff was forced into Chapter 11 by its other creditors" [*Id.*, ¶ 16].

## III.    ARGUMENT

### A.    Standard of Review

In analyzing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must decide whether the claimant is entitled to offer evidence to support the claims. In deciding whether to dismiss a claim under Rule 12(b)(6), the Court "accepts as true the well-pled factual allegations in the complaint, and construes them in the light most favorable to the plaintiff." *Stover v. 12 Technologies, Inc.*, 2003 Lexis 12126, *4 (N.D. Tex. 2003), *citing Taylor v. Books a Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002). "However, a complaint containing mere conclusory allegations or unwarranted deductions of fact may be insufficient to survive a motion to dismiss." *Id.*;



*Zuckerman v. Foxmeyer Health Corp.*, 4 F. Supp. 2d 618, 621 (N.D. Tex. 1998).  As the Fifth

Circuit has stated:

> Conclusory allegations and unwarranted deductions of fact are not admitted as true...especially when such conclusions are contradicted by facts disclosed by a document amended to the complaint.  *If the appended document...reveals facts which foreclose recovery as a matter of law, dismissal is appropriate.*

*Id., citing Assoc. Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974) (emphasis

in original).

Where the facts demonstrate that under no circumstances could the plaintiff prevail on its

allegations, the complaint should be dismissed.  *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d

80, 78 S. Ct. 99 (1957).  Further, any documents attached as exhibits to a pleading are a part

thereof for all purposes.  *See* Fed. R. Civ. P. 10 (c); *see also Neville v. American Republic Ins. Co.*,

912 F.2d 813, 814 n.1 (5th Cir. 1990).  Thus, it is appropriate for the Court to consider the contents

of the TPA and other attached documents when assessing J.C. Penney's motion to dismiss.

*Eastman Chemical Co. v. Niro, Inc.*, 80 F. Supp. 2d 712, 715 (S.D. Tex. 2000).

Two other rules of civil procedure come into play in this motion because the counts

involve claims of fraud and negligent misrepresentation.  Rule 9(b) provides that in averments of

fraud, "the circumstances constituting fraud...shall be stated with particularity."  Fed. R. Civ. P.

9(b)[2].  To accomplish the purposes of Rule 9(b), Plaintiff must at a minimum specify the time,

place and contents of the alleged false representation, as well as the identity of the person making

the alleged misrepresentation and what that person obtained thereby.  *Am. Realty Trust v. Bagley*,

No. 3:02-CV-0641-G, 2003 U.S. Dist. LEXIS 733, at *2-3; *6 (N. D. Tex. Jan. 16, 2003),

---

[2]    The Fifth Circuit held that where it is unclear from the pleadings whether a party's claim of misrepresentation is grounded in fraud or negligence, the court should apply the heightened pleading requirements of F.R.C.P. 9(b).  *See Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 723 (5th Cir. 2003).  Plaintiff in this case

reversed on other grounds, *Am. Realty Trust, Inc. v. Hamilton Lane Advisors, Inc.*, No. 03-10179, 2004 U.S. App. LEXIS 13981, at *14-15 (5th Cir. July 7, 2004) (granting defendant's renewed motion to dismiss because of plaintiff's failure to plead fraud with particularity). The Fifth Circuit has consistently applied the Rule 9(b) standard to require the face of the complaint to explain how the fraud worked. *United States ex rel. Wilkins v. North Am. Constr. Corp.*, 173 F. Supp. 2d 601, 613-618 (S.D. Tex. 2001).

Consistent with these principles, federal courts have not hesitated to dismiss claims such as those at issue here as a matter of law. *See, e.g., Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir.), *cert. denied*, 522 U.S. 966, (1997)(conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss); *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996); *Tuchman v. DSC Communications. Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994); *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994); *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 520 (5th Cir. 1993); *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993); *Tel-Phonic Services, Inc. v. TBS International, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992); *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992); *Grant-Brooks v. WMC Mortg. Corp.*, No. 3:02-CV-2455-AH, 2003 U.S.Dist. LEXIS 22593 (N.D. Tex. Dec. 9, 2003); *Stephens v. Halliburton Co.*, No. 3:02-CV-1442-L, 2003 U.S. Dist. LEXIS 15739 (N.D. Tex. Sept. 5, 2003); *Focus Direct Inc. v. Sekulow*, No. SA-02-CA-1175-RF, U.S. Dist. LEXIS 16672 (W.D. Tex. Aug. 15, 2003); *Johnson v. Metabolife Int'l*, No. 3:01-CV-2082-G, U.S. Dist. LEXIS 20665 (N.D. Tex. Oct. 23, 2002).

### B.    Stanley's Fraudulent Inducement Claim, Whether Based On Intentional Or Negligent Misrepresentation, Fails to State a Valid Claim

Plaintiff's fraud count alleges "J.C. Penney procured the delivery of conforming goods under its agreements with Plaintiff through fraud." [Pls. Com. ¶23]. This claim fails for several reasons.

---

has not urged a separate focus on the negligent misrepresentation claim, alleging the same facts as a purported basis for both claims. Hence, the allegations must satisfy Rule 9(b). *Id.*

**(1)    No inducement:  All alleged representations occurred *after* the contract was executed**

*First*, every statement identified by Plaintiff as alleged bases for its fraud claim occurred months if not years *after* the TPA was executed.  Plaintiff claims that J.C. Penney Buyers made multiple representations upon which it relied upon to its detriment. [Pl's. Com.  ¶ 8, 23, 24]. These statements could not have induced Plaintiff to enter into the TPA in March 1997.[3] Therefore, there can be no fraudulent inducement to contract.  *Haase v. Glazner*, 62 S.W.3d 795, 798-99 (Tex. 2001)([f]raudulent inducement is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof);  *Lyn-Lea Travel Corp. v. Am. Airlines*, 283 F.3d 282, 289-290 (5th Cir. 2002)([f]raudulent inducement is an elementary concept in the law of contracts and is intended to shield a party from liability in a contract action only when another party has procured the alleged contract wrongfully); Tex. Bus. & Com. Code Ann. § 27.01(a)(1)(1987) (fraudulent inducement requires showing that a false representation of a material fact induced a person to enter a contract and was relied upon by that person in entering the contract).

**(2)    Claim of negligent inducement of contract is barred by the statute of limitations**

*Second*, Plaintiff's fraudulent inducement to contract claim, to the extent Plaintiff is claiming a negligent misrepresentation as the method of inducement, is barred by the statute of limitations.  The statute of limitations for a negligent misrepresentation claim is two years. *Joslin v. Personal Investments, Inc.*, 2004 Lexis 4443, *10 (N.D. Tex. 2004), *citing Heci Exploration Co. v. Neel*, 982 S.W.2d 881, 886-87 (Tex. 1998).  The TPA was executed in March 1997.  Plaintiff filed its Original Complaint on December 22, 2005, more than two years later.  [See Court Docket

---

[3]    Indeed, every statement referenced in any manner in its First Amended Complaint post-date the contract.

for filing date]. Furthermore Plaintiff's Complaint makes multiple references to events occurring between 2002 and 2003 to support its negligent misrepresentation claims. Given that the instant complaint was not filed until December 22, 2005, all alleged events occurring prior to December 20, 2003 should be dismissed as a matter of law.

### (3) No Reliance: Plain terms of TPA negate reliance on post-contract communications.

*Third*, several provisions in the TPA conclusively negate any reasonable reliance on the part of Plaintiff on messages from a J.C. Penney Buyer. Under Texas law, a plaintiff must prove reasonable reliance. *Clardy Mfg. Co. v. Marine Midland Bus. Loans, Inc.*, 88 F.3d 347, 358 (5th Cir. 1996). A cause of action for fraud requires proof of "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, *which was relied upon*, and which caused injury." *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994)(emphasis added). Claims for negligent misrepresentation also require proof of reliance as an essential element. *Thompson v. Deloitte & Touche*, LLP., 902 S.W.2d 13, 19 (Tex. App.—Houston [1st Dist.] 1995, no writ).

The reasonableness of reliance is measured in light of plaintiff's intelligence and experience. *Clardy Mfg. Co.*, 88 F.3d at 358. Moreover, the context in which information is given will affect the conclusion whether a party was justified in relying thereon. *See, e.g.*, *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 794 (Tex. 1999)(finding unreasonable the reliance on an attorney's representations in an adversarial context).

Reliance is unjustified where the act of reliance is itself an act of negligence by the plaintiff. *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 615 (5th Cir. 1996). A party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests, and a failure to do so is not excused by mere

confidence in the honesty and integrity of the other party. *Coastal Bank SSB v. Chase Bank of Texas*, NA, 135 S.W.3d 840, 843 (Tex. App.—Houston [1st Dist.] 2004, no writ), *citing Thigpen v. Locke,* 363 S.W.2d 247, 251 (Tex. 1962)(other citations omitted).

In the present case, all of the representations occurred either months or years after the Plaintiff signed the contract. At the risk of repetition, this is the same contract which expressly states that modifications of its terms are not effective unless reference is made to Section 3.1 of the TPA; i.e. the modification is expressed in writing and signed by a J.C. Penney Merchandise Manager. Again, Plaintiff claims that it relied on a series of representations by named and unnamed buyers over a period of years. The communications referenced by Plaintiff in its own pleadings did not involve a J.C. Penney Merchandise Manager, but rather, multiple subordinate buyers. Moreover, none of the communications referenced as purportedly inducing Plaintiff to act constitute signed writings. Nor do they reference Section 3.1 of the TPA as required. Plaintiff then makes the quantum leap that it contractually and reasonably relied on these communications to its detriment. None of the plaintiff's alleged communications comply with the manner in which Plaintiff originally agreed that modifications could occur.

Therefore, any argument that Plaintiff could have relied on forms of writings that do not comply with the manner in which they previously agreed would be the *only* way the contract could be modified is belied by the plain language of the TPA. Thus no cause of action can lie.

### (4) The Economic Loss Rule Bars Plaintiff's Tort Claims

*Finally*, to the extent that Plaintiff is pleading some form of fraud occurring in the manner in which the contract was applied (rather an inducement-type claim)[4], Plaintiff cannot sue in tort

---

[4] The Texas Supreme Court in *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors*, 960 S.W.2d 41 (Tex. 1997) created an exception to the economic loss rule in connection with a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations. *Id.* at 46. This exception does

Defendant's Motion to Dismiss Brief
Page 10 of 18

for damages arising out of a breach of contract.  According to the economic loss rule, a plaintiff

may not recover for purely economic loss in tort where the parties' relationship is governed by

contract.  *Century Products Co. v. Cosco, Inc.*, 2001 U.S. Dist. Lexis 20328, *7 (N.D. Tex. 2001);

*Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494-95 (Tex. 1991)(no recovery for

negligence where duty breached was based solely in contract and the only injury was the

economic loss to the subject matter of the contract).

　　　In *Southwestern Bell Tel. Co. v. DeLanney*, the Texas Supreme Court explained that to

determine whether the economic loss rule bars recovery in tort, a court should examine the source

of the duty breached.  *DeLanney*, 809 S.W.2d at 494.  If the duty arises solely from the contract,

then the claim ordinarily sounds in contract only.  *Id.*  If, however, the duty exists separate and

independent from the contract, then the claim may also sound in tort.  *Id.*  Additionally, a court

should examine the nature of the injury.  *Id.*  If the injury is the economic loss to the subject matter

of the contract only, then the claim typically sounds in contract alone.  *Id.*

　　　Plaintiff appears to allege that J.C. Penney had a duty to refrain from enforcing its

contractual rights due to an alleged oral modification.  This duty does not exist given the express

terms of the TPA which renders such modifications ineffective.  In any event, the manner in which

J.C. Penney exercised chargeback rights are governed by the terms and conditions of the TPA that

sets forth those rights.  There is no independent duty in this regard.

　　　Further, the nature of Plaintiff's alleged injury is the economic loss to the subject matter of

the contract only.  Plaintiff seeks the difference between the invoice price and the amount paid and

the resulting lost profit and alleged "destruction of business" because of the shortfall in payment.

The amount J.C. Penney is legally obligated to pay derives solely from the contract; there is no

---

not apply to negligent misrepresentation claims.  *D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662
(Tex. 1998).

tort injury here and Plaintiff alleges no such injury.

### C.  Plaintiff Fails To Plead Fraud/Negligent Misrepresentation Claim With Particularity; Facts Suggest Promises Regarding Future Conduct.

Plaintiff makes no attempt to establish the type of misrepresentations which it now calls negligent. Instead, Plaintiff's complaint continues to rely on vague and anonymous statements which come no where close to the contractual requirements for modifying the Agreement.

Rule 9(b) requires that the "circumstances constituting fraud" be pled with particularity. Fed. R. Civ. P. 9(b). Pleading scienter requires more than a simple allegation that someone at J.C. Penney had fraudulent intent. *Am. Realty Trust*, at *6. To adequately plead fraudulent intent, the plaintiff must set forth specific facts that support an inference of fraud. *Id.* At a minimum, courts require the plaintiff to specifically state the time, place, and contents of the alleged false representation, as well as the identity of the person making the alleged misrepresentation and what that person obtained thereby. *Id.*

None of the statements in the Plaintiff's complaint present affirmative facts on which Plaintiff could rely. Instead, Plaintiff's complaint refers to requests for discussion, advising when a discussion would take place, an offer of settlement or some vague event. If these are statements that Plaintiff claims constitute fraud or misrepresentation, it is Plaintiff's burden to clearly allege how these statements caused harm, how they are false, what facts comprise an intent to mislead, and in the case of its allegation of an omission to speak, Plaintiff must describe the relationship giving rise to such a duty. *Shell Oil Company*, at 206 (under Rule 9(b), the complaint must contain the "who, what, when where, and how" of the false representation).

Regardless of the nature of Plaintiff's fraud claim, it must be dismissed because the information allegedly misrepresented necessarily concerns future events, not past or present facts. As a matter of law, such allegations cannot support a claim of fraud. *See Formosa Plastics Corp.*

*v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47-48 (Tex. 1998)("[a] fraud cause of action requires a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury."). Plaintiff alleges only that it was induced to supply goods via promises to waive certain penalties that were later imposed; by demands made after the parties executed a contract. In other words, Plaintiff appears to allege that J.C. Penney made a promise to waive certain penalties and later did not waive those penalties. These allegations do not support a claim of fraud or negligent misrepresentation.

**D. "Action for Price" Claim Fails Because All Invoices Paid; Difference Is Non-Compliance with Contract Terms**

An action for the price of goods requires pleading and proof that the buyer failed to pay the price of goods as it became due, **deducting from such balance damages owed for goods not conforming to the parties' contractual terms**. Tex. Bus. & Comm. Code Ann. § 2.717 (Vernon 2005); *Bacchus Indus., Inc. v. Frontier Mech. Contractors*, 36 S.W.3d 579 (Tex. App.—El Paso 2000, no writ.)(emphasis added). A buyer must fail to pay the price as it becomes due (after deduction for non-conformance with contractual terms) before an action for the price arises.

Plaintiff's claim for "Action for the Price" fails on two grounds. First, Plaintiff fails to allege that J.C. Penney failed to pay every invoice properly transmitted by the Plaintiff and received by J.C. Penney. Plaintiff complains only of a sum comprised of chargebacks, which Plaintiff has already agreed could be imposed under the parties' contract. Plaintiff has not alleged any particular invoice that was unpaid. As J.C. Penney did not fail to pay any invoice, there can be no "action for the price."

**E. Usury Claim Must Be Dismissed Because There is No Loan and No Lender**

Under Texas law, the elements for a usury claim are: (1) a loan of money; (2) an absolute

obligation to repay the principal; and (3) the exaction of a greater compensation than allowed by law for the use or forbearance of the money by the borrower. *Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 438 (5th Cir. 2004). Texas usury statutes are derived from the Texas Constitution. Article XVI, Section 11 of the Texas Constitution states: "The legislature shall have authority to classify loans and lenders, license and regulate lenders, define interest and fix maximum rates of interest." The statutes are designed to regulate loans. Section 301.002(a)(10) of the Texas Finance Code defines a "loan" as "an advance of money that is made to or on behalf of an obligor, the principal amount of which the obligor has an obligation to pay the creditor." Where there is not a loan or lending transaction there can be no usury. For example, in *Javier Garcia v. Texas Cable Partners, L.P.*, 114 S.W.3d 561, 566 (Tex. App.—Corpus Christi 2003, no writ), the court held that a rental or lease agreement was not a "lending transaction" and therefore late charges assessed on overdue payments could not be usurious interest. *See also, Domizio v. Progressive County Mutual Ins. Co.*, 54 S.W.3d 867, 874 (Tex. App.—Austin 2001, no writ)(late fees assessed on an insurance contract did not constitute interest for the detention of money).

Usury statutes are strictly construed against a finding of usury because they are penal in nature. *Home Savings Ass'n. v. Crow*, 514 S.W.2d 160 (Tex. 1975); *Stacks v. East Dallas* Clinic, 409 S.W.2d 842 (Tex. 1966) (if a transaction is susceptible to more than one reasonable construction when viewed as a whole, the court must adopt the construction which comports with legality and refuse to find a usury violation). There is no usury unless there is a loan of money and the question is whether the transaction involved a loan or attempted loan of money. *Struthers v. Drexel*, 122 U.S. 487, 7 S.Ct. 1293, 30 L.Ed. 1216 (1887).

Plaintiff alleges that its intentional breach of a term of the parties' contract (J.C. Penney Billing Instructions and Billing Requirements) should be characterized by this Court as a loan of

money from J.C. Penney and J.C. Penney's assessment of penalties for this breach are usurious. Plaintiff cannot in good faith make such an allegation while at the same time acknowledging its awareness and compliance with the Trading Partner Agreement. By its own pleadings, Plaintiff agreed and therefore knows that if it electronically transmitted invoices prior to the date it shipped merchandise it would be subject to a chargeback. Instead, Plaintiffs usury claim seeks to transform a chargeback procured through its own breach into a claim for usury. For the reasons stated below, Stanley's claim is untenable as a matter of law.

### (1) No "Loan" of Money

Plaintiff claims that according to a chargeback form it attaches to its complaint, "defendant advanced money to Plaintiff." [Pl's. Com. p. 11, ¶ 28]. There is nothing on the referenced document demonstrating an advancement of money. A column entitled "amount due" appears to calculate a difference between an invoice date and a ship date with an assessment of .00033 per day. The description is "invoices billed prior to shipping." There is no reference to any loan of money. The description is "invoices billed prior to shipping." There is no refernce to any loan of any money. For a "loan" to exist, there must be an understanding that a principal be repayable absolutely. *Pansy Oil Co. v. Federal Oil Co.*, 91 S.W.2d 453, 457 (Tex. Civ. App.—Texarkana 1936, no writ. ref'd writ).

Finally, nothing in the Plaintiff's complaint alleges that it had a legal right to "borrow" money from J.C. Penney in any event. The only way for the Plaintiff to obtain any money would have been through a breach of performance under the contract. Where there is no legal or contractual right to make a loan, there cannot be usurious interest under Texas law. *Bexar County Ice Cream Co., Inc. v. Swenson's Ice Cream Co.*, 859 S.W.2d 402, 407 (Tex. Civ. App.—San Antonio 1993, no writ), overruled on other grounds, *Barraza v. Koliba*, 933 S.W.2d 164 (Tex.

App. – San Antonio 1996, writ den.).

### (2) There is No Absolute Obligation To Repay A Principal

Further, Plaintiff has not established that there is a principal to be repaid or transfer of money. The penalty was applied to Plaintiff's invoice amount. Plaintiff's invoice to J.C. Penney can hardly be characterized as principal that Stanley had an obligation to repay.

In addition, if the sum to be paid is based on a contingency, it is not to be considered usurious. *Id.* at 407. Here, the imposition of a penalty is contingent upon at least two factors: Plaintiff's failing to conform its invoicing procedures to the parties' contract and its failure to audit its own billing practices. Thus, there is no usury. *Id.* ("[s]ince the amount of payments that would be due [Swenson's] from [Bexar County] depended on the contingency of gross sales, and since no lending or credit transaction was involved, we hold that the facts in this case do not amount to usurious interest.").

### (3) Transaction is Not Governed by Title 4 of Finance Code

The chargebacks upon which Plaintiff bases its usury claim are the result of Plaintiff's non-compliance with a condition of performance under the contract. Such a triggering event cannot be characterized as interest on a loan of money. The chargeback process as applied to suppliers of goods and merchandise for resale is not even governed by Title 4 of the Texas Finance Code, which is entitled "Regulation of Interest, Loan and Financed Transactions."

The relationship between Stanley and J.C. Penney, as described in Plaintiff's Complaint, is one of buyer and seller of goods, not one of lender and borrower. There was no understanding between the parties that any "principal" of a loan be absolutely repaid.

### (4) If Considered "Interest" on a "Loan," Rate is Not Usurious

In the alternative, if Plaintiff's breach of the contract accomplished a "loan" its invoice

amount considered "principal" and associated penalty is characterized as "interest on a loan," the Texas Finance Code Section 303.009 and other provisions of Texas law permit the charging of interest in the amount at issue.  Using the principles of "spreading" of interest rate calculations as set forth in *Tanner Development Co. v. Ferguson*, 561 S.W.2d 777 (Tex. 1977), the rate charged to Plaintiff was not usurious.

### F.    No Support for Exemplary Damages

While Plaintiff seeks exemplary damages, there are no facts supporting fraud, negligent misrepresentation or conversion as required.  Tex. Civ. Prac. & Rem. Code Ann. § 41.003 (a)(Vernon 2004).  As is the case with its allegations of fraud, Plaintiff's failure to plead essential facts—which are solely within its knowledge and control—constitutes grounds for dismissal.

### G.    No Action For Quantum Meruit

As Plaintiff's claim for the economic loss consisting of the difference between the price Plaintiff charged for merchandise and the amount paid by J.C. Penney, and incidentals depends upon the application of the TPA, and the fact that there is a contract governing the parties' relationship, there is no claim for "unjust enrichment."  *Woodard v. Southwest States, Inc.*, 384 S.W.2d 674, 675 (Tex. 1964)("[r]ecovery on an express contract and on quantum meruit are inconsistent.  Where there exists a valid express contract covering the subject matter, there can be no implied contract.").

## IV.    CONCLUSION

For the foregoing reasons, the defendant J.C. Penney respectfully requests that the foregoing motion to dismiss be granted.

DATED: January _18_, 2006

Respectfully submitted,

Nicholas A. O'Kelly (TBN 15241235)
J.C. Penney Corp., Inc.
Legal Department
6501 Legacy Drive
Plano, Texas 75024
(972) 431-2471 (phone)
(972) 431-1133 (facsimile)

***Attorney for Defendant***
***J.C. Penney Corporation, Inc., et al.***

## CERTIFICATE OF SERVICE

I hereby certify that on this _18TH_ day of January, 2006, a true and correct copy of the

foregoing pleading was sent via first class mail delivery to:

Robert J. Filteau, Esq.
Filteau & Sullivan, P.C.
1634 Columbia Street
Houston, Texas 77008

Nicholas A. O'Kelly

# J. C. PENNEY COMPANY, INC.

## ELECTRONIC DATA INTERCHANGE
## TRADING PARTNER AGREEMENT

### WITH

*GALLERY INDUSTRIES*

03637-6
42218-8 Arizona

Y:\00000\rkh\0259f-96.116
7/1/96

**Exhibit "A"**


# Table of Contents

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Article 1 - Prerequisites . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Section 1.1 - Documents; Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Section 1.2 - Third Party Service Providers . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Section 1.3 - System Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Section 1.4 - Security Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Article 2 - Documents and Transmissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Section 2.1 - Proper Receipt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Section 2.2 - Verification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Section 2.3 - Garbled Documents and/or Transmissions . . . . . . . . . . . . . . . . . . 2

Article 3 - Transaction Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Section 3.1 - Terms and Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Section 3.2 - Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Section 3.3 - Validity; Enforceability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Article 4 - Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 4.1 - Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 4.2 - Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 4.3 - Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 4.4 - Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 4.5 - Force Majeure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 4.6 - Limitation of Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**List of Attachments**

Appendix  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Attachment  - Terms and Conditions of Penney's Standard Domestic Wholesale
Contract/Listing Sheet Forms, Penney Form Nos. JCP-6698 and
DP-9741 [Revised July 1, 1996] . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3

# J. C. PENNEY COMPANY, INC.
## ELECTRONIC DATA INTERCHANGE
## TRADING PARTNER AGREEMENT

THIS ELECTRONIC DATA INTERCHANGE TRADING PARTNER AGREEMENT (the

"Agreement"), made __MARCH_____, 19 97 between J. C. PENNEY COMPANY, INC. ("Penney"),

a Delaware corporation, with offices at 6501 Legacy Drive, Plano, Texas 75024-3698 and

__GALLERY INDUSTRIES_____ ("Seller"), a __CA_____ corporation,
                                                    (State of Incorporation)

with offices at _____9265 NW 101 STREET, MEDLEY, FL    33178_____

## PRELIMINARY STATEMENT

As a result of the use of available electronic technologies, Penney and Seller desire to
facilitate purchase and sale transactions ("Transactions") by electronically transmitting and
receiving data in agreed formats in substitution for conventional paper-based documents and to
assure that these Transactions are legally valid and enforceable. Therefore, the parties, intending
to be legally bound, agree as follows:

### Article 1
### Prerequisites

**Section 1.1 - Documents; Standards**.  Each party may electronically transmit to or
receive from the other party any of the transaction sets listed in the Appendix (as each term is
defined by the standards set forth in the Appendix) and transaction sets which the parties by
written agreement add to the Appendix (collectively, "Documents").  Any transmission of data
which is not a Document will have no force or effect between the parties unless justifiably relied
upon by the receiving party (collectively, "Transmissions").  Unless otherwise provided herein,
all Documents and Transmissions will be transmitted in accordance with the standards and the
published industry guidelines set forth in the Appendix.

**Section 1.2 - Third Party Service Providers**

**Section 1.2.1**   Documents and Transmissions will be transmitted electronically to
each party either directly or through any third party service provider ("Provider") with which
either party may contract.

**Section 1.2.2** Each party shall be responsible for the costs of any Provider with which it contracts, unless otherwise set forth in the Appendix.

**Section 1.2.3** Each party shall be liable for the acts or omissions of its Provider while transmitting, receiving, storing or handling Documents, or performing related activities on its behalf, provided, that if both parties use the same Provider to effect the transmission and receipt of a Document or a Transmission, the originating party shall be liable for the acts or omissions of the Provider with respect to that Document or Transmission.

**Section 1.3 - System Operations**. Each party, at its own expense, shall provide and maintain the equipment, software, services and testing necessary to effectively and reliably transmit and receive Documents and/or Transmissions.

**Section 1.4 - Security Procedures**. Each party shall properly use those security procedures, including those specified in the Appendix, if any, which are reasonably sufficient to ensure that all transmissions of Documents and/or Transmissions are authorized and to protect its business records and data from improper access.

**Article 2**
**Documents and Transmissions**

**Section 2.1 - Proper Receipt**. Documents and/or Transmissions will not be deemed to have been properly received, and no Document or Transmission will give rise to any obligation, until accessible to the receiving party at the receiving party's receipt computer.

**Section 2.2 - Verification**. Upon proper receipt of any Document and/or Transmission, the receiving party shall promptly and properly transmit a functional acknowledgement in return. A functional acknowledgement will constitute conclusive evidence that a Document or a Transmission has been properly received.

**Section 2.3 - Garbled Documents and/or Transmissions**. If any Document or Transmission is received in an unintelligible or garbled form, the receiving party shall promptly notify, in a reasonable manner, the originating party (if identifiable from the received Document or Transmission). In the absence of such a notice, the originating party's records of the contents of the Document will control. However, if the originating party is not identifiable from the received Document or Transmission, as the case may be, the receiving party will have no obligation with respect to that Document or Transmission, as the case may be.

**Article 3**
**Transaction Terms**

**Section 3.1 - Terms and Conditions**. This Agreement is to be considered part of any other written agreement referencing it or referenced in the Appendix under the heading "EXISTING AGREEMENTS/TERMS AND CONDITIONS". It is expressly understood by the

parties that nothing in this Agreement supersedes any written agreement entered into by the parties on the forms referenced in the Appendix and any modification to this or those agreements must be approved by the parties in writing. In the absence of any other written agreement applicable to any Transaction made under this Agreement, the Transaction (and any related communication) will also be subject to Penney's standard Terms and Conditions governing domestic purchase contracts as referenced in the Appendix, including any amendments to those contracts. If any other document, whether in written or electronic form, contains any language which would modify, release or discharge Seller from any of its obligations under this Agreement or any agreement referenced in the Appendix, that language will be of no effect unless reference is made, in writing, to this Section 3.1 and/or to the other agreement and, in either case, the document is acknowledged and accepted in writing by an authorized representative of Penney.

Section 3.2 - Confidentiality. All information contained in any Document, Transmission or otherwise exchanged between the parties will be considered confidential, except to the extent provided by written agreement between the parties or by applicable law.

Section 3.3 - Validity; Enforceability.

Section 3.3.1   Any Document or Transmission properly transmitted under this Agreement will be considered, in connection with any Transaction, any other written agreement described in Section 3.1, or this Agreement, to be a "writing" or "in writing"; and that Document or Transmission will be deemed for all purposes (a) to have been "signed" and (b) to constitute an "original" when printed from electronic files or records established and maintained in the normal course of business.

Section 3.3.2   The conduct of the parties under this Agreement, including the use of Documents and Transmissions properly transmitted, will, for all legal purposes, evidence a course of dealing and a course of performance accepted by the parties in furtherance of this Agreement, any Transaction and any other written agreement described in Section 3.1.

Section 3.3.3   The parties will not contest the validity or enforceability of Documents under the provisions of any applicable law relating to whether certain agreements are to be in writing or signed by the party to be bound thereby. Documents, if introduced as evidence on paper in any judicial, arbitration, mediation or administrative proceedings, will be admissible as between the parties to the same extent and under the same conditions as other business records originated and maintained in documentary form. Neither party may contest the admissibility of copies of Documents under either the business records exception to the hearsay rule or the best evidence rule on the basis that the Documents were not originated or maintained in documentary form.

## Article 4
## Miscellaneous

**Section 4.1 - Termination**.  This Agreement will remain in effect until terminated by either party with not less than thirty (30) days prior written notice, which notice must specify the effective date of termination; provided, however, that any termination will not affect the respective obligations or rights of the parties arising under any Documents and/or Transmissions or otherwise under this Agreement prior to the effective date of termination.

**Section 4.2 - Severability**.  If any provision of this Agreement is found to be invalid or unenforceable, the balance of this Agreement will remain in effect, and, if any provision is inapplicable in any circumstance, it will nevertheless remain applicable in all other circumstances.

**Section 4.3 - Entire Agreement**.  This Agreement and the Appendix constitute the complete agreement of the parties relating to the matters specified in this Agreement and supersede all prior representations or agreements, whether oral or written, with respect to these matters.  No oral modification or waiver of any of the provisions of this Agreement will be binding on either party.  No obligation to enter into any Transaction is to be implied from the execution or delivery of the Agreement.  This Agreement is binding upon the parties and their permitted successors and assigns.

**Section 4.4 - Governing Law**.  THIS AGREEMENT IS TO BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF TEXAS REGARDLESS OF THE DICTATES OF TEXAS CONFLICT OF LAWS PROVISIONS.  THE PARTIES HEREBY SUBMIT TO THE EXCLUSIVE JURISDICTION AND VENUE IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION, OR THE DISTRICT COURTS OF COLLIN COUNTY, TEXAS.

**Section 4.5 - Force Majeure**.  No party shall be liable for any failure to perform its obligations in connection with any Transaction, any Document or any Transmission, where the failure results from any act of God or other cause beyond that party's reasonable control (including, without limitation, any mechanical, electronic or communication failure) which prevents that party from transmitting or receiving any Documents and/or Transmissions.

**Section 4.6 - Limitation of Damages**.  Neither party shall be liable to the other for any special, incidental, exemplary or consequential damages arising from or as a result of any delay, omission or error in the electronic transmission or receipt of any Documents and/or Transmissions under this Agreement, even if either party has been advised of the possibility of such damages.

Each party has caused this Agreement to be properly executed on its behalf as of the date first above written.

**J. C. PENNEY COMPANY, INC.:**         **SELLER:**

GALLERY INDUSTRIES

By: _____         By: _____

Printed Name: _____         PrintedName: MICHAEL STERN
            VIM PICHETTI

Title: _____         Title: VICE PRESIDENT
            BUYER

Y:\0000Prkh\0259f-96.116
''1/96                                                        5

## Appendix

## STANDARDS

Specify all applicable standards (and the issuing organizations): American National Standards Institute, Accredited Standards Committee X12 ("ASC X12") and, to the extent they may be applicable to domestic transactions, the United Nations Electronic Data Interchange for Administration, Commerce and Transport ("UN/EDIFACT") and all subsets of these standards, e.g., VICS, TCIF, AIAG.

Selected standards include, as applicable, all data dictionaries, segment dictionaries and transmission controls referenced in those standards, and include the Transaction Sets listed in the "DOCUMENTS" section of this Appendix below.

## DOCUMENTS

| Transaction Set No. | Document Name or Description | Version Release | Verification Required (Yes or No) | Acceptance Required (Yes or No) | Acceptance Document | |
|---|---|---|---|---|---|---|
| | | | | | Transaction Set No. | Document Name or Description |
| 850 | Purchase Order | Then current and one prior version | Yes | No | Not Applicable | Not Applicable |
| 855 | Purchase Order Acknowledgement (Used as reverse p.o.) | Then current and one prior version | Yes | No | Not Applicable | Not Applicable |
| 860 | Purchase Order Change | Then current and one prior version | Yes | No | Not Applicable | Not Applicable |

## GUIDELINES

Specify ALL applicable published industry guidelines: NONE

The provisions of this Agreement (including this Appendix) shall control in the event of any conflict with any listed guide-lines.

## ALLOCATION OF PROVIDER COSTS

(If no special allocation has been agreed upon, enter "NONE"): NONE

## SECURITY PROCEDURES

(If no security procedures have been agreed upon, enter "NONE"): NONE

## EXISTING AGREEMENTS/TERMS AND CONDITIONS

Contracts on Penney's standard domestic Wholesale Contract/Listing Sheet Forms, Penney Form Nos. JCP-6698 or DP-9741, or their replacements, entered into from time to time by the parties. (A copy of the standard terms and conditions appearing on such forms is attached hereto and is incorporated into this Agreement by this reference for all purposes.)

A-2

## Attachment

Terms and Conditions of Penney's Standard Domestic Wholesale Contract/Listing Sheet Forms, Penney Form Nos. JCP-6698 and DP-9741 [Revised July 1, 1996]

### J. C. PENNEY COMPANY, INC. ("PENNEY")

This instrument is subject to the following express terms and conditions:

1. **Seller's Representations and Warranties**.   Seller represents and warrants to Penney, in addition to all warranties implied by law, that each item of merchandise described on the face hereof, whether produced in whole or in part by Seller or a third party, together with all related packaging, labeling and other printed matter and all related advertisements furnished or authorized by Seller ("Merchandise") shall (a) be free from defects in design, workmanship or materials including, without limitation. such defects as could cause personal injury or create a hazard to life or damage to property; (b) be fit for its particular purpose and be suitable for use, be manufactured, be packaged for shipment, be properly labeled, including marked with the country of origin, where applicable, and be registered as required, all in accordance with and under all applicable laws, ordinances, regulations, rulings, orders, decrees, resolutions, norms, standards, requirements, policies, or directives of any governmental authority or within the United States of America (including, without limitation, the United States Fair Labor Standards Act of 1938), the country(ies) of origin and/or exportation of the Merchandise, and any country to which the Merchandise will be shipped ("Legal Requirements"); (c) not infringe or encroach upon any third party's personal, contractual or proprietary rights, including patents, trademarks, trade names, copyrights, rights of privacy, rights of publicity, or trade secrets granted or recognized under the laws of the United States or any other country to which the Merchandise will be shipped ("Destination Country"); (d) conform to all specifications and other descriptions set forth or incorporated herein, or otherwise agreed to by the parties, and all articles accepted as satisfactory by Penney as Merchandise samples: (e) be free and clear of all third-party liens, claims, and encumbrances of any kind upon acceptance by Penney; and (f) possess all performance qualities and characteristics claimed in advertisements or printed materials issued or authorized by Seller.  Seller also represents and warrants that it and any third party involved in the production of the Merchandise are and will be in compliance with all Legal Requirements and, with respect to this Contract, have satisfied all applicable Legal Requirements, including, without limitation, those for the filing of general and continuing guarantees, and will so file before delivery of Merchandise to Penney, with the appropriate United States agency, with copy to Penney, under applicable statutes, including, without limitation. Fur Products Labeling Act, Wool Products Labeling Act of 1939, Textile Fiber Products Identification Act, Flammable Fabrics Act, Hazardous Substances Act, and Food, Drug and Cosmetic Act. Further, Seller

represents and warrants that the Merchandise. whether produced in whole or in part by Seller or a third party, is not adulterated or misbranded under any applicable Legal Requirements, including, without limitation. the United States Food, Drug and Cosmetic Act and the United States Hazardous Substances Act.

2.   **Reseller Purchasers**.   Penney may sell the Merchandise to others for resale, including, without limitation, one or more of Penney's subsidiaries, divisions, or affiliates, or other companies independent of Penney ("Reseller Purchasers"). Penney's rights under this Contract, including, without limitation. its rights to indemnification, shall also inure to the benefit of such Reseller Purchasers, subsequent purchasers therefrom and their successors and assigns.

3.   **Seller's Contractors**.  If Seller arranges to have the Merchandise produced in whole or in part by a third party, Seller shall do so pursuant to a written contract that contains representations and warranties by the third party that conform to Seller's representations and warranties under this Contract (including, in particular, Seller's representations and warranties as to compliance with Legal Requirements).

4.   **Seller Representatives**. Neither employees, agents, contractors, nor other representatives of Seller ("Seller Representatives"), including, without limitation, Seller Representatives who come into any store or other facility, or onto any premises, of Penney or any Reseller Purchaser, may represent that they are, nor may they be deemed to be, employees, agents, contractors, or representatives of Penney or such Reseller Purchaser for any reason or purpose, including, without limitation, entitlement to employee compensation or benefits from Penney or such Reseller Purchaser.   Seller shall direct and control Seller Representatives in all their activities and fully compensate them for such activities. Seller shall pay all contributions, taxes, and other amounts required to be paid by an employer with respect to the compensation of any Seller Representative who is an employee of Seller under applicable law.  Seller shall maintain Worker's Compensation and Employer's Liability Insurance with respect to Seller Representatives and Public Liability Insurance covering their activities.

5.   **Product Warranties Offered By or Through Seller**.   Prior to entering into this Contract, Seller shall provide Penney with a copy of all product warranties offered by or through Seller with respect to each item of Merchandise described on the face hereof, and shall provide Penney with sufficient quantities of applicable warranty materials, including, without limitation, copies of each product warranty offered by or through Seller for the benefit of consumers in compliance with the Magnuson-Moss Warranty Act, the rules, regulations, statements and interpretations issued thereunder, and any other applicable Legal Requirement. Seller represents and warrants that a copy of the written warranty shall accompany every consumer product warranted by or through Seller.

6. **Defective Merchandise**. Merchandise that is not in conformity with Seller's representations, warranties, and guarantees set forth in this Contract or otherwise expressly stated by Seller, or with any implied warranties of Seller ("Defective Merchandise"), may, until the expiration of one year following the later of resale by Penney or any Reseller Purchaser (subject to the below Merchandise Recall provisions), be returned to Seller by Penney or the Reseller Purchaser for, at Penney's sole option, (a) refund of the purchase price, (b) repair, or (c) replacement, all at Seller's expense. Alternatively, at Penney's sole option, Defective Merchandise may be repaired by Penney or the Reseller Purchaser at Seller's expense. Any repairs that are done shall include, without limitation, those necessary to render the Merchandise suitable or acceptable for use and/or possession under all Legal Requirements. If, due to the nature of the Defective Merchandise, or for commercially valid reason(s), Penney elects neither to (a) return such Defective Merchandise to Seller nor (b) have repairs done, Seller, at Penney's sole option, shall either replace the Defective Merchandise or refund the purchase price. Seller shall be solely responsible for bearing any and all costs associated with (a) the transportation, consolidation, processing, and shipment of replacement and Defective Merchandise, as well as compliance with Legal Requirements applicable to such Merchandise, both inbound and outbound, including, without limitation, packaging, labeling, packing, warehousing, freight, insurance, taxes, duties, brokerage, fees, liens, penalties, and consequential and liquidated damages ("Ancillary Costs"); and (b) examining, testing, and auditing the Defective Merchandise. Defective Merchandise that Penney elects neither to return nor have repaired may be destroyed or otherwise disposed of by Penney or Reseller Purchaser in a commercially reasonable manner, and Seller shall bear all costs of such destruction or disposition.

7. **Late or Unauthorized Merchandise**. Merchandise that is shipped by Seller after the applicable order cancellation date(s) ("Late Merchandise"), or any unauthorized item that is substituted for any item of Merchandise without the prior written approval of Penney ("Unauthorized Merchandise"), may, at Penney's sole option and at Seller's expense, be returned by Penney to the Seller or be disposed of by Penney. When Late or Unauthorized Merchandise is returned to Seller, Seller will refund to Penney the purchase price of such Late or Unauthorized Merchandise and reimburse Penney for all Ancillary Costs.

8. **Returned Merchandise; Risk of Loss**. In the event of a dispute with respect to the return of Merchandise, Penney chargeback forms shall be prima facie evidence that the Merchandise was returned by Penney or the Reseller Purchaser, and the burden shall be upon Seller, or its successor or assign, to show by clear and convincing evidence that such Merchandise was not returned by Penney or the Reseller Purchaser. The risk of loss with respect to Merchandise returned to Seller pursuant to this Contract shall be upon Seller or its successor or assign.

9. **Merchandise Recall**. When there is reliable information that reasonably supports the conclusion that a determined or undetermined number of items of Merchandise fail to comply with any Legal Requirement or contain defects or hazards that could cause risk

of death or bodily injury to or damage to the property of any person: (a) Penney or Reseller Purchaser shall notify Seller, and Seller shall take all appropriate steps in accordance with all Legal Requirements; and (b) Penney or Reseller Purchaser may notify the United States Consumer Product Safety Commission and/or any other governmental authority having jurisdiction over such matters and may, at Seller's expense, do whatever Penney or Reseller Purchaser deems necessary to do or is required or requested to do by any governmental authority, including, without limitation, locating, identifying, and notifying customers and recalling such Merchandise, whether in the possession of Penney, any Reseller Purchaser from Penney, or the customers thereof. If Seller formulates a recall plan or is planning to enter into any agreement with any governmental authority regarding the recall of Merchandise sold to Penney hereunder, Seller shall obtain from Penney and any Reseller Purchaser prior written approval of the terms of any such plan or agreement. Upon any recall of such Merchandise by Seller or Penney or Reseller Purchaser, said Merchandise shall be repaired or replaced, or the purchase price shall be refunded, pursuant to the recall plan, all at Seller's expense, including, without limitation, costs and expenses incurred by Penney and/or Reseller Purchaser. If Seller becomes aware of any product safety hazard or violation of any Legal Requirement, Seller shall immediately notify Penney in writing.

10.   **Penney's Right to Cancel, Terminate and/or Rescind.**  Penney may cancel, terminate, and/or rescind all or part of this Contract if Seller (a) breaches any representation, warranty, guarantee, or other obligation of Seller under this Contract or (b) becomes insolvent or subject to any bankruptcy, insolvency, or receivership proceedings.

11.   **Chargebacks.**   Upon Penney's (a) return of Defective, Late, Unauthorized, or recalled Merchandise, (b) destruction or other disposition of Defective or recalled Merchandise, (c) discovery that Merchandise was omitted by Seller in packing, or (d) exercise of any of its rights under Section 10 above with respect to any quantity of Merchandise that it has received, Penney may, in lieu of requesting a refund or reimbursement from Seller, issue a chargeback against Seller's account for the purchase price of such Merchandise, plus any Ancillary Costs and any other related costs and expenses of Penney or any Reseller Purchaser for which Seller is responsible hereunder. Penney may also issue a chargeback against Seller's account for any other cost or expense of Penney or any Reseller Purchaser for which Seller is responsible hereunder, such as those associated with Penney's or Reseller Purchaser's repair, destruction, or other disposition of Defective, Late, Unauthorized, or recalled Merchandise or incurred by Penney or Reseller Purchaser in connection with a Merchandise recall. If the affected Merchandise is returned to Seller, Penney's chargeback will include a processing fee as set forth in the "JCPenney Billing Instructions and Business Requirements" ("Billing Instructions"). The Seller must notify Penney in writing within 60 days of the date that a chargeback is issued by Penney if the Seller disputes the chargeback; otherwise, the chargeback will be deemed valid as between Penney, or any Reseller Purchaser, and Seller, its successor or assign. All chargebacks will be issued in accordance with the Billing Instructions, which are incorporated by

reference into this Contract, but which Penney, in its sole discretion, may amend from time to time.

12. **Indemnification.**   (a) Seller will indemnify and hold harmless  Penney and Reseller Purchasers, and their respective parents, subsidiaries, affiliated companies, and divisions, and their directors, officers, employees. and agents (collectively referred to as "Indemnitees"), from and against any and all claims. actions, proceedings, losses, profits, liabilities, judgments, penalties, liens, forfeitures, fines, damages (including liquidated, consequential, and punitive damages), costs, and expenses, including counsel fees and costs of settlement (collectively referred to as "Claims"), which shall arise or result from (1) any breach or  alleged breach of any representation, warranty, guarantee, or other obligation of Seller under this Contract; (2) any damage to or destruction of property or any injury to or death of persons arising or resulting from any actual or alleged defect in the Merchandise or any act (of commission or omission) of Seller or Seller Representa-tives with respect to the Merchandise; (3) any damage to or destruction of property or any injury to or death of any Seller Representative arising or resulting from his/her representation of, or work for, Seller with respect to the Merchandise or any other product or service offered, sold, or performed by or on behalf of Seller; or (4) a determination by any governmental authority that a Seller Representative is an employee, agent, contractor, or representative of Penney, any Reseller Purchaser, or any other Indemnitee. IN THE CASE OF A CLAIM BASED UPON AN ACTUAL OR ALLEGED DEFECT IN THE MERCHANDISE OR A BREACH OR ALLEGED BREACH OF ANY REPRESENTA-TION, WARRANTY, OR GUARANTEE AS TO THE MERCHANDISE, SELLER WILL INDEMNIFY INDEMNITEES (I) EVEN IF THE CLAIM IS CAUSED BY THE ACTUAL OR ALLEGED SOLE OR PARTIAL NEGLIGENCE OR OTHER FAULT OF PENNEY OR ANY OTHER INDEMNITEE, OR IS ONE FOR WHICH PENNEY OR SUCH INDEMNITEE MAY BE HELD STRICTLY LIABLE TO A THIRD PARTY; AND/OR (II) EVEN IF PENNEY, ANOTHER INDEMNITEE, OR ANY OTHER PERSON, ALONE OR WITH OTHERS, DESIGNED, DEVELOPED THE SPECIFICA-TIONS OF, OR SUPPLIED OR PROCURED ANY OF THE MATERIALS OR COMPONENTS FOR, THE MERCHANDISE.  In the case of Penney private label Merchandise, even if Seller cannot be identified specifically as the seller of particular Merchandise containing an actual or alleged defect, Seller will indemnify Indemnitees if Seller can be identified by Penney as having been one of several sellers of similar merchandise;  (b) If any Claim based upon any of the matters referred to in subparagraph (a) above is brought against any Indemnitee, Penney shall promptly notify Seller, and Seller shall resist and defend such Claim by reputable counsel retained at Seller's expense and shall obtain Penney's prior approval of any counsel employed to defend such Claim. If Penney does not approve counsel to be employed by Seller, Penney or any other Indemnitee shall have the right to retain its own counsel, and the expense of such counsel shall be paid by Seller.  Indemnitees shall have the right to participate fully in all proceedings, including settlement discussions. shall be provided copies of notices, orders, and all other papers. and shall be given prior notice by Seller of all meetings, hearings, and other discussions involving such Claim.  Seller shall consult with Indemnitees and

keep them fully advised of the progress of any such Claim, shall make no admissions or otherwise act in a manner that might be prejudicial to any Indemnitee's rights in connection with any such Claim, and shall have no right to settle or discuss settlement of any such Claim, without the prior written approval of the affected Indemnitee(s). If Seller shall fail to undertake any Indemnitee's defense within a reasonable time after receiving notice of a Claim, such Indemnitee may each undertake its own defense, without affecting in any manner its right to indemnity hereunder. (c) Any controversy between Seller and any Indemnitee concerning Seller's obligations under this indemnity may be litigated in the same forum and concurrently with any action or proceeding against such Indemnitee to which such controversy may relate, and Seller agrees to appear  voluntarily in such forum and submit itself to the jurisdiction thereof.

13.   **Products Liability Insurance**.  During the five-year period  following the delivery of Merchandise to Penney, Seller shall maintain, at its expense, products liability insurance relating to such Merchandise in amounts not less than $2,000,000 for bodily injury and property damage liability for each occurrence and in the aggregate per policy year.  This insurance shall be extended to include "vendors coverage," name Penney and any Reseller Purchaser designated by Penney as an additional insured with respect to such coverage, and be written with such insurance companies and contain such provisions as shall be satisfactory to Penney.  Seller shall, at least within 10 days of execution of this Contract, furnish Penney with certificates of insurance confirming the existence of such insurance and stipulating that the insurer will give Penney at least 30 days written notice prior to any cancellation of or material change in insurance and of any failure to renew such insurance.

14.   **Quality Assurance, Factory Evaluation, and Merchandise Inspection**.  Seller shall maintain an adequate quality assurance program so as to assure that the Merchandise shall meet the specifications and other descriptions set forth or incorporated herein as to appearance, performance, reliability, durability, and safety under applicable Legal Requirements.  Seller shall, from time to time, furnish to Penney, at Penney's request, results of such program.  Penney, from time to time, upon reasonable advance notice to Seller, shall have the right to (a) visit, inspect, and evaluate the facilities at which the Merchandise is being, or may be, manufactured and/or warehoused, and/or (b) inspect relevant quality assurance and safety records and documents pertaining to any representations and/or obligations of Seller hereunder.  At Penney's request, Seller shall provide pre-production samples of the Merchandise, and during and after production make the Merchandise available, for inspection and testing.  If Penney determines that such inspection or testing should be conducted by a third party, the cost thereof, including the cost of transmitting samples or items of Merchandise to the third party's laboratory by airmail, courier, or otherwise, shall be borne by Seller.  If, in Penney's sole judgment, such inspection or testing indicates any failure to conform with the requirements of this Contract, Penney shall be entitled to any of, or all, the remedies with respect to Defective Merchandise specified herein.  Neither Penney nor any Reseller Purchaser from Penney shall be obligated to inspect or test the Merchandise before resale.

15.   <u>Government Access</u>.   If any governmental authority asks Penney or any Reseller Purchaser to demonstrate that the Merchandise was manufactured, packed for shipment, packaged or labeled, including marked with country of origin, or registered or documented in compliance with any Legal Requirement, and, in that connection, seeks access to the facility(ies) in which the Merchandise was manufactured, packed for shipment, packaged and/or labeled, or to documents pertaining to such activities, Seller will, upon Penney's request, grant such access to the authorized representatives or agents of such governmental authority.

16.   <u>Certifications, Ratings, and Approvals</u>.   If a certification, rating, or approval for the Merchandise is required by any Legal  Requirement, or is customarily provided under generally  accepted industry practices in any Destination Country, such as a "listing" issued by Underwriters Laboratories, Inc., for plug-in electrical products, Seller shall, at its expense, obtain the required or customary certification, rating, or approval from independent institutions approved by Penney or the affected Reseller Purchaser or, if necessary, the appropriate governmental authority.

17.   <u>Replacement Parts</u>.   With respect to any Merchandise requiring replacement parts and/or servicing, Seller shall, during the seven-year period following the last delivery of such Merchandise to retail customers of Penney or any Reseller Purchaser, obtain and maintain an inventory of replacement parts for such Merchandise, for sale to Penney, any Reseller Purchaser, or their  respective customers, in sufficient quantities to meet the  reasonably anticipated needs of Penney, any Reseller Purchaser, and their customers and service representatives at prices not to exceed those charged to other  purchasers of comparable quantities of similar parts and operating at the same functional level.

18.   <u>Tooling</u>.   All tools, dies, molds, and similar items employed in the manufacture of the Merchandise shall be furnished at Seller's expense unless otherwise specifically provided for in writing.

19.   <u>Packaging and Labeling</u>.   Merchandise shall be packaged and labeled in accordance with Penney's specifications and all applicable Legal Requirements. Penney, at its option, may make available to Seller, at Seller's expense, packaging and labeling  materials for Penney private label Merchandise.  If Seller wishes to obtain packaging and labeling materials  for such private label Merchandise from other sources, it must first obtain all applicable specifications from Penney and submit advance samples of such packaging and labeling materials for Penney's  prior written approval.

20.   <u>Invoices and Payments</u>.   In accordance with the procedures outlined in the Billing Instructions, each shipment of Merchandise to Penney hereunder shall be supported by Seller's invoices showing the applicable unit price for each item shipped, or, where the face of this Contract so indicates, the invoice shall show the store cost that Penney for internal accounting purposes may have determined to assess its individual facilities. Seller shall receive payment for each such invoice and apply the same to Penney's account,

debiting or crediting Penney monthly as appropriate. Seller's records relating to such shipments, invoices, and payments may be audited by Penney representatives upon reasonable notice at reasonable times for a period of two years after the later of delivery of Merchandise to Penney or any Reseller Purchaser.

21.  **Intellectual Property**.  If this Contract deals with Merchandise that bears or utilizes intellectual property rights, including, without limitation, the private labeling, trademarks, service marks, trade names, trade dress, company name, distinctive words, slogans, copyrighted or copyrightable materials, patented or patentable inventions, logos, pictures, or designs owned or licensed for use by Penney, any affiliated company, or any Reseller Purchaser from Penney ("Identities"), Seller shall not sell or otherwise transfer or dispose of such Merchandise to third persons unless the Identities have been physically removed or completely obliterated from the Merchandise to the satisfaction of Penney or such Reseller Purchaser, or prior written authorization to sell, transfer or dispose of such Merchandise with the Identities intact is obtained from the responsible Penney Merchandise Manager or one of his/her superiors, or the responsible manager of Reseller Purchaser, as the case may be.

22.  **Special Features**.  All Merchandise designs, mechanical features, specifications, and other descriptions that have been supplied to Seller by Penney or any Reseller Purchaser, or that are distinctive of private label Merchandise of Penney, any affiliated company, or any Reseller Purchaser ("Special Features"), shall be the property of such entity, and Seller may use the Special Features only in Merchandise manufactured pursuant to this Contract. Seller shall not sell or otherwise transfer or dispose of Merchandise with Special Features to third parties, unless written authorization to do so is obtained from the responsible manager of the owner of the Special Features, who, if Penney is the owner, is the responsible Penney Merchandise Manager or one of his/her superiors. Such owner may use the Special Features in any merchandise manufactured by others and obtain such legal protection as may be available for the Special Features, including, without limitation, patents, design patents, copyrights, and trademarks. Seller shall timely execute any and all instruments deemed by such owner to be necessary or desirable to obtain such protection in all countries of the world.

23.  **Alteration or Modification of Specifications**.  Penney may notify Seller in writing of any alterations or modifications of the specifications or descriptions of the Merchandise that Penney wishes to make, and Seller shall be deemed to have accepted Penney's proposed alterations or modifications without additional cost to Penney and without enlargement of Seller's time for performance, unless Seller, within 20 days following receipt of Penney's notice, notifies Penney, in writing, of the resultant changes in cost and/or time for performance. Upon receipt of such a notice from Seller, Penney shall have the option, within 20 days thereafter, to notify Seller, in writing, that Penney is canceling its order for all or a portion of the Merchandise under this Contract. In the case of Merchandise requiring product service, Seller may not make any alteration or modification that affects the interchangeability of parts or introduces new parts or changes

the configuration or layout of existing parts. unless the product service number designation of the Merchandise affected by such alteration or modification is changed by including a modification suffix that will indicate such alteration or modification and Penney shall have been advised in advance of such alteration or modification and given its prior written approval thereof. Upon notification of such alteration or modification. Penney shall determine if a new suffix is required and shall notify Seller of any suffix change. All cartons shall contain exterior markings that set forth the model number and any such modification suffix.

24.    Confidentiality.    Except as otherwise required by any Legal Requirement, Seller shall not, without prior written consent of Penney, disclose the existence or terms of this Contract or any oral or written information proprietary and/or confidential to Penney, its affiliates, Penney's other vendors, or any Reseller Purchaser, and shall not otherwise identify itself as a seller of Merchandise to Penney or any such Reseller Purchaser.

25.    Setoff.    Penney may setoff against any amounts payable to Seller all present and future indebtedness of Seller to Penney arising from this Contract or any other transaction or occurrence.

26.    Delegation or Assignment.    Penney and Seller hereby expressly acknowledge and agree that Penney has entered into this Contract based in substantial part upon the attributes that Seller and its business offer in view of the management, services and method of operation of Seller. Accordingly, Seller's obligations hereunder cannot be delegated without the prior written consent of Penney. Any such consent by Penney must be signed by the responsible Penney Merchandise Manager or one of his/her superiors. Furthermore, Penney and Seller intend this Contract to be a contract under which applicable law excuses Penney from accepting performance from anyone other than Seller within the meaning of Sections 365(c) and 365(e)(2) of the United States Bankruptcy Code, 11 U.S.C. Sections 365(c), 365(e)(2). Seller agrees that, if Seller assigns or otherwise disposes of its right to payment hereunder, Seller shall so notify Penney immediately, in writing, and. upon receipt of such notice, Penney, at its sole option, shall have the right to extend the time of payment with respect to 15 percent of each invoice for a period not to exceed six months from the date of receipt of each invoice, unless any such assignee or other party entitled to receive payment shall agree, in writing, that (a) Penney may assert against such assignee or other party any defense that Penney may have against Seller, whether arising before or after the assignment, and whether arising out of this Contract or any other transaction, and (b) the assignee or the other party entitled to receive payment shall refund to Penney any monies paid by Penney to such assignee or other party to the extent of any shortages and returns of Merchandise not recovered by Penney by credit or refund from Seller.

27.  **Miscellaneous**.  (a) All rights granted to Penney hereunder shall be in addition to and not in lieu of Penney's rights arising by operation of law. (b) No modification of the terms of this Contract shall be valid unless in writing and signed by the responsible Penney Merchandise Manager or one of his/her superiors. (c) If any provision of this Contract is held invalid, void, or unenforceable, this shall not affect the validity of the remaining provisions. (d) All the terms and conditions hereof shall apply to additional quantities of Merchandise ordered by Penney, except to the extent expressly modified, changed, or amended by a new contract. (e) Seller agrees to follow the shipping instructions issued by Penney, unless otherwise specified on the face hereof.  (f) All Seller's obligations, representations, warranties, and guarantees hereunder, express or implied, shall survive delivery of the Merchandise to Penney and any resale of the Merchandise by Penney or any Reseller Purchaser. (g) THIS CONTRACT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW THEREOF. THE PARTIES HEREBY SUBMIT TO EXCLUSIVE JURISDICTION AND VENUE IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION, OR THE DISTRICT COURTS OF COLLIN COUNTY, TEXAS. (h) The waiver of any provision of this Contract shall be effective as against Penney only if such waiver is in writing signed by the responsible Penney Merchandise Manager or one of his/her superiors and then only in the specific instance and for the particular purpose for which it was given.  No failure to exercise and no delay in exercising any right or power shall operate as a waiver by Penney. (i) This Contract shall be binding upon and inure to the benefit of the parties, and Reseller Purchasers, and their respective successors, permitted  assigns, and any subsidiary or affiliated company effectively controlled by  any of them. (j) Any notice given by either party pursuant to this Contract shall be deemed to have been received by the other party upon the sending thereof by receipted courier, express mail, registered or certified mail, or facsimile transmission, addressed to such party at the address, or number, designated by that party. A notice given by facsimile transmission shall not be effective until the original of such notice is also sent by receipted courier, express mail, or registered or certified mail.  Any notice Seller is required to send to Penney shall be sent to the appropriate Penney Merchandise Manager, unless otherwise provided herein or in a separate writing.